### WESTINGHOUSE ELECTRIC & MFG. CO. v. UNION CARBIDE CO.

### THOMSON–HOUSTON ELECTRIC CO. v. SAME.

(Circuit Court of Appeals, Second Circuit.    May 29, 1902.)

#### Nos. 135, 136.

**1. PATENTS—INVENTION—ELECTRICAL CONVERTERS.**
    The Westinghouse patent, No. 366,362, claim 4, which covers an electric converter constructed with open spaces in its core, and an inclosing case containing oil or paraffin, adapted to circulate through such spaces and about the converter, for the purpose of cooling the same, discloses invention, was not anticipated, and is valid.

**2. SAME—ANTICIPATION**
    The Thomson patent, No. 508,654, for a device for cooling electric transformers, which are surrounded by oil or like insulating fluid, by passing a pipe containing running water through the case inclosing the transformer and such fluid, is void for lack of novelty in view of the prior art, and especially of the Pyke & Barnett British patent of 1890.

Appeals from the Circuit Court of the United States for the Western District of New York.

In Equity. Suits for infringement of letters patent No. 366,362, issued July 12, 1887, to George Westinghouse, Jr., and No 508,654, issued to Elihu Thomson November 14, 1893, both for cooling transformers. On appeals from decrees for complainants.

For opinion below, see 112 Fed. 417.

A. C. Fowler, for appellant.

Thos. B. Kerr, for appellees.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. The specification of the Westinghouse patent in suit states its subject-matter as follows:

"The invention relates to the construction of a class of apparatus employed for transforming alternating or intermittent electric currents of any

required character into currents differing therefrom in certain characteristics. Such apparatus are usually termed 'induction coils' or 'converters.' "

This apparatus comprises a core of soft iron wound with two coils of insulated copper wire,—the one a primary coil, which receives and transmits the magnetic current; the other, a secondary coil, which transforms the pressure and quantity of the current according to the purpose for which it is required. The type of transformer here under consideration is known as the "step-down transformer." A current of high pressure and small volume transmitted from a distance may, by its use, be transformed to a current of low pressure and large volume, and then adapted for ordinary household uses. The object of the Westinghouse improvement is stated by the patentee as follows:

"The object of this invention is to provide a simple and efficient converter, which will not become overheated when employed for a long time in transforming currents of high electro-motive force, and which will be thoroughly ventilated."

The patentee primarily proposed to obviate the serious objection of loss of energy by overheating involved in such transformation by separating the plates of the core and the primary and secondary coils from each other, so as to permit of ventilation. This construction adapted for ventilating purposes is covered by the other claims not in suit, and is not involved herein. The particular construction which is the subject of the fourth claim,—the only one involved herein,—is suggested as follows:

"It may be preferred in some instances to surround the converter with some oil or paraffin or other suitable material, which will assist in preserving insulation, and will not be injured by heating. This material, when in a liquid form, circulates through the tubes and the intervening spaces of the coils and plates, and preserves the insulation, excludes the moisture, and cools the converter. The entire converter may be sealed into an inclosing case, H, which may or may not contain a nonconducting fluid or a gas."

Said claim is as follows:

"(4) The combination, substantially as described, of an electric converter constructed with open spaces in its core, an inclosing case, and a nonconducting fluid or gas in said case, adapted to circulate through said spaces and about the converter."

Complainant contends that this claim covers a transformer whose surfaces are cooled by means of oil circulating through said open spaces in said core and confined in said inclosing case. The first objection raised to this contention is estoppel by reason of proceedings in the patent office. There the patentee, it is true, erased a claim for a combination of a converter and inclosing air-tight case, and a fluid therein, which was identical with the claim in another pending application, and modified his claims for ventilating spaces between the core and the coils. But the claim here in suit was filed with his original application, and it was never canceled or modified. That other combinations originally claimed by him were old appears from the prior art. Converters having open spaces in the core to avoid heat-

ing were old.   In the Hindley & Buffham patent of 1882 (No. 266,-290), for a generator, is disclosed the arrangement of wires "whereby openings or spaces are provided for the free circulation of air," in order "to overcome in a great degree the generation of heat"; and the patentees describe the winding of the coils "in separate groups, so that air can freely circulate through them."   And in this patentee's earlier patent, No. 342,553 of 1886, he stated that its object was to "construct the converter in such manner that there shall be but little loss of energy through heating the iron," and described a core composed of thin plates "separated from each other by intervening washers or plates of nonmagnetic material,—such as vulcanized fiber,—and an air space may be left, if desirable, between each two plates."   The use of oil or other nonconducting fluid to reduce the conductivity of the wire coils of a dynamo when driven at a high speed and thus reduce the heat is described in the Millar patent, No. 270,457, of 1883.

Defendant's counsel chiefly rely on the Stanley patent, No. 349,612 of 1886, for an induction coil, in which, they say, they "have the identical combination of the fourth claim of the Westinghouse patent." This patent is for a converter.   The plates of the core are so stamped as to form interior and exterior teeth.   Of the plates the specification says:

"They are placed upon each other, the positions of the teeth coinciding; but they are insulated or separated from each other by paper, cloth, asbestus, oil silk, air, or other well-known insulating material, and they are firmly bolted or otherwise secured together."

The specification further says:

"The coil is preferably protected by being placed within a suitable case consisting of a base, F, to which there is secured a removable cover, F'. In the cover there are preferably formed perforations, f,f."

Although the drawings do not show open spaces in the core, and defendant's expert assumes that there are no such spaces, yet it appears from the foregoing description that the patentee conceived the idea of a separation of the plates either so as to admit air or to provide for the insertion of some fabric for purposes of insulation. The description and drawings of the Stanley patent show a base plate and perforated cover adapted to ventilate the converter and to protect it from physical injury.   We have, then, in the prior art every element of the combination claimed, and a physical combination of the same elements, except that the separations in Stanley are not adapted to, and the construction of the inclosing case is prohibitive of, the purposes of the claim in suit.   This claim covers such an inclosing case as will confine the nonconducting fluid, and such open spaces in the core as will permit the circulation of the liquid through them.   Westinghouse, then, was the first to patent such an air-tight, closed converter.   Does the combination covered by the claim in suit show patentable invention?   If the idea of ventilation be rejected, and the patent be confined to the statement of and claim for the inclosed construction, it embodies at least a combination radically

117 F.—32

modified from those of the prior art, in order to adapt it to a novel purpose. The primitive telegraph coils of the Brooks patent of 1878 were immersed in oil "to protect them from the influence of the damp atmosphere"; and the Miller dynamo, without open spaces in its core, had its coils suspended in a tank of oil. But the construction of these devices excluded the novel idea of oil which would "circulate through the tubes and intervening spaces of the coils and plates." And while the assumed or suggested separations between the plates of the Stanley patent would be sufficient for insulation only, and not for circulation, its inclosing case is not sealed so as to contain the circulating oil, and the use of oil is not suggested. In these circumstances, the patentee seems to be entitled to claim the means by which the external and internal surfaces of the heat-producing parts of a converter were cooled by such an arrangement and separation of parts as would permit the circulation about them of oil, and the means for the retention of said oil within and about said surfaces, whereby the heat from the oil radiated to the surrounding air. If there is any doubt upon the question of patentability, the practical and commercial results of this improvement must resolve such doubt in its favor.

It appears that in the early history of the art only small converters were used, and the heat generated in them was dissipated by radiation into the surrounding air. But when the art began to call for converters exceeding 10 kilowatts in capacity, it was found, as stated by the expert for complainant, "that the capacity of the transformer increased as the cube of the linear dimensions, and the heat, if the amount of loss was held stationary, would increase in like proportion, while the radiating surface would increase only as the square of the linear dimensions." Further difficulties were encountered, resulting from the inequality of the conductivity of iron and copper. The testimony herein shows that these difficulties were so serious that for some time it was feared that the practical limit of such transformers had been reached; that experiments were made by grouping, by the use of lower current densities, by filling the cases with oil, and by subdividing the iron and copper parts of the converters by large ducts, and using forced drafts. It was only when, as the result of these experiments, it was found that the oil would circulate through the ducts that any practical progress was made. Then, as complainant's expert says, "the problem of making large units became greatly simplified. It became only necessary to so subdivide the coils and iron so as to expose a uniform surface as compared with the losses in the transformer in all sizes, and to provide a case having sufficient external surface to enable the oil again to give up its heat to the surrounding air, to make transformers of any desired capacity." The practical result of the invention in suit, as testified to by complainant's experts, was to so increase the capacity of converters that, while a dry converter, cooled by the natural circulation of air, is limited to 10 kilowatts, the oil-insulated converters of the patent in suit are commercially serviceable up to 500 kilowatts.

The evidence of increased utility and resultant commercial success is

developed and forcibly argued in support of the Thomson patent. It is contended that by the use of the improvement therein claimed converters with a capacity of about 2,000 kilowatts have been constructed, and the limit has not yet been reached. The Thomson patent is for cooling transformers, designed "to preserve the transformer comparatively cool by exposing oil or other insulating fluid in which the transformer is immersed to some special artificial cooling medium which may be passed through the oil, or through which the oil may be circulated."

The means by which this object is accomplished, as shown by Fig. 1 of the drawings, comprises the external pipe, P, and P', filled with oil, and so connected with the transformer chamber, which is also

Fig.1.

Fig.2.

filled with oil, as to permit of continuous circulation. The patentee says:

"A pipe, W, which may be part of a city water system, contains the cooling medium, and the pipe, P, is expanded into a casing surrounding it as shown. In actual practice it would be better to arrange the cylinder, D, at a higher level than is illustrated,—say around the pipe, P,—so that the oil or other fluid cooled in the cylinder may fall therefrom through the pipe P', being replaced by heated oil coming through pipe P."

In Fig. 2 the water pipe is shown within the chamber. The claims are as follows:

"(1) The combination of a receptacle or chamber containing one or more transformers surrounded by oil or like insulating fluid, with a cooling medium circulating in a pipe passing through a greater or less portion of the fluid, as set forth. (2) The combination, with a receptacle containing one or more transformers surrounded by an insulating fluid, of a pipe passing through said chamber and fluid, and means for causing a cooling medium to flow through said pipe, substantially as described."

The contention of counsel for complainant is that:

"Thomson combined, for the first time in the history of the electrical art: (a) An inclosing receptacle, containing (b) an electrical device liable to destruction from its own heat; and also (c) an insulating (moisture repelling) fluid carrier of the heat from the surface of the device to (d) a pipe passing through and presenting to the fluid carrier a heat-absorbing surface kept cool by (e) a refrigerating medium flowing in the pipe under pressure from an outside source."

That is, Thomson was the first to cool the oil in the Westinghouse converter by exposing it to a pipe of running water. That he was not the first to show how to accomplish this result is shown by the Pyke & Barnett British patent of 1890, on which all the claims of his original application were rejected. These patentees say:

"It is obvious that the external substances into which the heat is finally dissipated may be air, water, etc., and that the cooling vessel may be internal or external to the apparatus container."

Claim 5 is as follows:

"(5) In an electric coil or inductional apparatus cooled by means of a circulating fluid insulator, the extension of the container surface by means of corrugations, projections, or a coupled vessel for the purpose of cooling the circulating insulator."

Counsel for complainant is forced to admit that the difference between the two structures is that Thomson has limited himself to a pipe. This he was obliged to do in order to secure his patent. Counsel for complainant says:

"The said pipe characterizes the physical difference between the Thomson improvement and the Pyke & Barnett, while its function is wholly lacking in the Pyke & Barnett."

The functional difference relates to other objects sought to be accomplished by Pyke & Barnett. In the discussion of this construction counsel and experts for complainants are forced to rely on the Thomson pipe and the commercial results of the Thomson improve-

ment. The argument that the Pyke & Barnett patent does not show that the water circulates either inside or outside the case is met by the drawings, which show, and the statement in the specification which describes, "a pair of flexible pipes which connect the vessel, F, with the cooler, H, both at the top and the bottom, in order to establish a continuous circulation of the insulating liquid." In view of this patent, and of the judicial notice taken by the courts of matters of common knowledge, and illustrated in cooling apparatus in Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200, and in Solvay Process Co. v. Michigan Alkali Co., 33 C. C. A. 285, 90 Fed. 818, it is difficult to see how any claim of novelty in this patent can be sustained. An attempt has been made to show that "the introduction of water into the converter was an idea wholly inconsistent with the teachings and practice of the art." In support of this contention one of the experts for complainant testifies as follows:

"Moisture was, at the date of the Westinghouse patent in suit, recognized as the deadliest enemy of the operator of electric light and power apparatus; not only because of the fact that it constantly tended to render that apparatus unreliable, but because it assisted in setting up leakages and arcs which were usually destructive, and often deadly."

But it does not appear that any such objection would exist when the moisture is confined in a "cooling vessel," as in Pyke & Barnett. The patentee makes no reference to the existence of any such danger or difficulty, or to any object of his invention, except "to provide an artificial cooling medium." The improvement is manifestly within the knowledge and scope of the general field of the arts. It is at most merely the use of an old device for a new and analogous purpose, without the necessity of any adaptation in order to discharge the old function in the new device. Its confessed commercial success, therefore, cannot be accepted as evidence of invention.

The decree is affirmed as to patent No. 366,362, and reversed as to patent No. 508,654.