WESTINGHOUSE ELECTRIC & MFG. CO. v. WAGNER ELECTRIC MFG. CO.

(Circuit Court, E. D. Missouri, E. D.    February 13, 1904.)

No. 4,657.

1. PATENTS—INFRINGEMENT—ELECTRICAL CONVERTERS.

The Westinghouse patent, No. 366,362, claim 4, for an electric converter constructed with open spaces in its core, an inclosing case, and a nonconducting fluid or gas in said case, adapted to circulate through said spaces and about the converter for the purpose of cooling the same, construed, and *held* not infringed by a converter in which spaces were left between the coils and between them and the inclosing core for containing a cooling liquid, but which had no open spaces in its core.

2. SAME—CONSTRUCTION OF CLAIMS—ESTOPPEL.

Where a patentee and complainant, his assignee, had for a number of years placed a certain construction on a claim of his patent, with knowledge that during such time defendant was making and selling a device for a similar purpose, but which did not infringe the patent as so construed, complainant is estopped to claim a different construction for the purpose of charging defendant with infringement.

In Equity. Suit for infringement of letters patent No. 366,362, for an electrical converter granted to George Westinghouse, Jr., July 12, 1887. On final hearing.

Kerr, Page & Cooper, Bakewell & Cornwall, and B. F. Babbitt, for complainant.

Fowler & Bryson, for defendant.

ADAMS, District Judge. This is a suit based on the fourth claim of letters patent of the United States No. 366,362, granted to complainant's assignor July 12, 1887, for new and useful improvements in electric converters. The relief asked for is an injunction restraining the defendant from infringing the claim and an accounting. The patent has been in litigation before. On May 10, 1900, complainant instituted a suit on the same patent in the Circuit Court of the United States for the Northern District of New York against the Union Carbide Company (112 Fed. 417), which will hereafter be referred to as the "Carbide Case." The defendant in this case, being the manu-

facturer of the device claimed to constitute an infringement in the Carbide Case, appeared, and conducted the defense, and it is conceded is bound by the decree therein rendered. Before final submission of that case complainant dismissed as to claims 1, 2, 3, and 5, submitting claim 4 only to the final judgment of the court. The defenses to that action were want of patentable invention and noninfringement. The trial court decided that claim 4 of the patent was valid, and that defendant had infringed the claim by manufacturing the device then before the court, and this decree was affirmed by the Circuit Court of Appeals for the Second Circuit. 117 Fed. 495, 55 C. C. A. 230. The present action is based on the same claim (4), and no controversy is now made except on the issue of infringement. Defendant contends that this present device is so different from the device involved in the Carbide Case that the judgment in that case is not res adjudicata of the present issue of infringement, and that in fact the defendant's device does not infringe claim 4. The only question for decision, therefore, is whether the defendant's device constitutes an infringement of claim 4 of the patent in suit. The invention of the patent relates, according to the specification, "to the construction of a class of apparatus employed for transforming alternating or intermittent electric currents of any required character into currents different therefrom in certain characteristics," and the object of the invention, according to the specification, is "to provide a simple and efficient converter which will not become overheated when employed for a long time in transforming currents of high electro-motive force, and which will be thoroughly ventilated." The claim in question is as follows:

"(4) The combination, substantially as described, of an electric converter constructed with open spaces in its core, an inclosing case, and a nonconducting fluid or gas in said case adapted to circulate through said spaces and about the converter."

Complainant claims that the converter, now commonly called a "transformer," manufactured by the defendant, infringes claim 4 in three particulars: First, because there is an open space between the coils themselves; second, because there is a rectangular opening inside of the core, through which the coils pass; and, third, because there are open spaces between the core and the coils. The question for determination is whether either of these three spaces or openings constitute "open spaces in its core" within the true meaning of claim 4 of the patent.

I have reached the conclusion that the defendant's transformer does not, by reason of either one or all of the above-mentioned features, have "open spaces in its core," within the true meaning of the patent in suit, for the following reasons:

First. The fact that there is a space between the two coils when inserted in the core is not an infringement of claim 4 for the most obvious reason that claim 4 calls for no such space, and for the quite equally obvious reason that claim 1, which is not now in controversy, does contain that element. From these two facts it is altogether probable that the patentee did not himself understand or intend that claim 4 should be construed as containing the element. After a careful reading of the opinion of the Court of Appeals in the Carbide Case, 117 Fed. 495, 55

C. C. A. 230 (which is conceded by counsel to be binding upon the defendant in this case), I find no reason for reading the element of "open space between the coils" into claim 4.

Second. The drawings and description of complainant's patent, as well as the model shown in evidence and used in argument, show a device in which the coils completely fill the opening in the surrounding core, and in which parallel open spaces a few inches apart appear in the substance of the core, extending throughout its body in such way as to permit the oil in which the transformer is submerged to freely circulate about the surrounding core and into the interior. A longitudinal section of this device is shown in Fig. 2 of the drawings of the patent, which is as follows:

*Fig. 2.*

These numerous parallel open spaces so shown in the drawings and model, and any other open spaces, whether parallel or not, cutting through the body of the surrounding core and extending into the interior opening containing the coils, are, in my opinion, the "open spaces in its core" contemplated by claim 4. The purpose of these open spaces, as disclosed by the patent and the evidence of experts, is to permit the oil to so bathe the heat-producing surfaces of the transformer, and to so circulate throughout the parts of the transformer, as to preserve the insulation of the coils, and radiate the heat generated by the transformer's action. The use of oil or paraphine in a tank inclosing the transformer for the purposes just specified has been long known to the art, and is recognized by at least two patents prior in date to complainant's patent. Accordingly, the invention has for its main purpose only the physical means for effectually securing this circulation of oil. It deals with the core itself, and divides it up into groups of plates, each group separate from the other in such way as to make numerous parallel open spaces in the core leading from its outer surface on all its four sides into the interior opening made for the introduction of the coils. This interior opening, called in the patent "two rectangular openings,

$e^1$ and $e^2$, through which the wires pass," is not, in my opinion, "an open space in its core," within the meaning of claim 4. I adopt the views of Prof. Nipher with respect to this rectangular opening. He says: "The core is not the core of a transformer or converter until these rectangular openings are made through it." He says further: "These openings give character to the core." "It is not a core until they exist there." "The core is in fact given such a form ·that it surrounds the coil in a certain sense, and the space so surrounded by the core might be called a 'coil opening.'" The core of a transformer is the iron part of it. It must be so constructed as to permit the introduction of the coils of wire approximately through its center. The wire coil must be put in to make a transformer. I cannot understand how this space left in the inside of the iron for this purpose can be an open space in the core. It might be as well said that the space left on the outside of the iron, between it and the incasing tank, is an open space in the core. The defendant's device has a space between the coils, and has also this rectangular opening for the introduction of the coils into the core, but, for the reasons above expressed, these are not "open spaces in its core," within the meaning of the patent in suit.

Third. The defendant's device also has certain open spaces between the core and the coils, as shown in its model in evidence. The complainant's device has no such spaces. Complainant's core hugs the coils closely, and thereby secures greater efficiency of action. But it is contended that these spaces between the core and coils are the mechanical equivalent of the spaces in the core already considered. I cannot agree to this view of the case. They are physically two different things. One (the complainant's) has the spaces cutting the core throughout its whole substance, thus permitting the oil to percolate copiously into all heat-producing surfaces. The other (defendant's) has its spaces inside the core between its inner surface and the outer surface of the coils, thereby releasing the grasp of the core upon the coils, and decreasing the efficiency of its transforming action. If the patent in suit were a broad and valid patent for a circulatory system throughout the heat-producing parts of a transformer, the two devices might be the mechanical equivalent; but it is not such a patent. It is distinctly a patent for a machine involving physical elements, and I cannot bring myself to think the spaces of the defendant's device between the core and the coils are the same as the open spaces in the core of complainant's device, or the mechanical equivalent thereof. They may perform the same function, but they do it by means of different physical elements, and the defendant's device is constructed at the expense of efficiency, which the complainant's device avoids.

The problem for years before the grant of complainant's patent was to devise efficient means for cooling the heat-producing surfaces of the transformer, and for protecting the insulation of the coils. The complainant invented the physical means shown in claim 4. The defendant adopted the totally different physical means shown in its model. In view of the foregoing, I cannot construe the opinion in the Carbide Case as giving the complainant the monopoly of all means by which the external and internal surfaces of the heat-producing parts of a converter can be cooled. This view would preclude the use of any and every

other device looking towards the accomplishment of the main object, namely, the circulation of oil throughout the heat-producing parts of a converter. The opinion in that case uses the language that the patentee was "entitled to claim the means" for accomplishing that object, manifestly referring to the means claimed in claim 4, and described in the patent, namely, of opening up the core itself in the way already pointed out, leaving all other means (not the mechanical equivalent, however) open to the free use of the public.

I think the construction which I have already placed on claim 4 is the one which complainant itself placed upon that claim for years, and in fact until the spring of 1903, when it moved in this case for a rule to punish the defendant for contempt.

In 1887, on the same date the patent in suit was granted, the patentee, George Westinghouse, Jr., secured a British patent for a device of similar construction to that employed in the defendant's transformer. The drawings and claims of that British patent show a transformer with open spaces between the coils and between the coils and the core. Claims 10 and 11 of that patent distinctly call for "strips of insulating material extending along the sides of the coils and separating the same from the surrounding core." The American and British were applied for and secured at the same time. Accordingly, it is obvious that the patentee had in mind the construction involved now in defendant's device, and he deemed it important enough to be made the subject of a separate patent. To give him now the monopoly of this construction by virtue of his American patent would, in my opinion, give him something which he intentionally failed to claim when he secured it, and which he obviously then thought should be specifically claimed in order to secure it.

Again, it clearly appears that the defendant was engaged in making its transformer for some years prior to the hearing of the Carbide Case, and that the witnesses in that case knew of this fact. They certainly knew that defendant was manufacturing a transformer with open space between the coils and a rectangular opening into the core for the insertion of the coils. But no attempt was there made to hold these features to be an infringement of claim 4 of the patent. Complainant there contented itself by claiming the parallel open spaces throughout the core itself to be an infringement. After the judgment was rendered in that case, the complainant, with full knowledge that the defendant was manufacturing transformers with the open spaces and openings now claimed to be an infringement of claim 4, never sought to hold the defendant guilty of contempt for violation of the injunctive order in that case. After that injunctive order became final, the defendant conformed thereto by changing its transformer so as to close up all the parallel open spaces throughout the core itself, leaving the core one solid mass of iron plates with no open spaces in it, but retaining in its structure the open spaces between the coils and between the core and coils as before, and has continued to manufacture such transformers, so modified, from that day to this. The proof shows no claim that the use of this modified structure constituted a violation of the injunctive order in that case.

Soon afterwards the present suit was instituted, and a preliminary injunction was granted against the defendant restraining it from infringement. This restraining order was consented to by defendant under the belief that it related exclusively to the same kind of a transformer which was declared an infringement in the Carbide Case, and I am satisfied that counsel on both sides so regarded it at the time. In due time after the institution of this suit the defendant filed an answer admitting that the judgment in the Carbide Case was an estoppel against it as to the validity of claim 4, and consenting to a final decree enjoining it from infringing that claim. At about this juncture complainant and defendant, by counsel, came to an understanding that neither party should take any evidence until further notice. The case remained in this condition for about a year; and in the meantime defendant refrained from manufacturing or selling the transformer condemned as an infringement in the Carbide Case, but continued to manufacture and sell the transformer now claimed to be an infringement. This condition of things remained until May, 1903, when a motion was made to punish defendant for contempt on the ground that the manufacture and sale of its present transformer was a violation of the preliminary injunction granted in this case. This motion was denied, and since then proofs have been taken, and the cause is now submitted for a final decree. All of these facts convince me that complainant's present claim that defendant's present transformer is an infringement of claim 4 of its patent is an afterthought on its part, and that from the date of its British patent, in 1887, to the date of filing the motion to punish defendant for contempt, in May, 1903, the complainant continuously interpreted claim 4 of its patent as not covering the defendant's device now in question. This seems to me to be such a contemporaneous and continuous construction put upon claim 4 of the patent by complainant, and one upon which defendant has innocently acted, that complainant ought to be estopped at this late day from asserting the contrary.

The patent in suit has only about five months longer to run. It expires on July 12th of this year. To now enjoin the defendant, after it has been manufacturing, selling, and advertising the transformer complained of for a period of about eight years, as shown by the testimony, and under circumstances disclosed by this record, would, in my opinion, be grossly inequitable. My conclusions are:

1. That the transformer now being used by the defendant is not, within the true meaning of the patent itself, an infringement of claim 4.

2. The construction which I have placed upon this claim is in harmony with the contemporaneous and continuous construction placed upon the same claim by the patentee himself, and by the complainant.

3. The complainant, by its own conduct, is estopped from claiming the contrary.

The decree will be that the defendant be enjoined from manufacturing or selling the transformer like that declared an infringement in the Carbide Case, and for the usual accounting, but it will be so framed as to exclude from its operation the transformer now manufactured by the defendant, which has afforded the only issue before the court in this case.

I am not disposed to work out the question of costs, though the statute relating to disclaimer (section 4922, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3396]) as that involves a lengthy consideration of the question whether the complainant should not, before bringing this suit, have entered a disclaimer as to claims 1, 2, and 5 of the patent. I think the equity of the matter can be reached by a direct order concerning the costs. The complainant had a right, as long as the defendant was making use of the transformer adjudged to be an infringement in the Carbide Case, to institute its suit for an injunction and accounting by reason thereof; and, notwithstanding the fact that defendant admitted the infringement in its answer, the complainant should not be adjudged to pay all of the costs of this proceeding. I think an equitable disposition of this matter is to require each of the parties to pay its own costs, and it will be so ordered.