WESTINGHOUSE ELECTRIC & MFG. CO. v. AMERICAN TRANS-
FORMER CO.

(Circuit Court, D. New Jersey. May 10, 1904.)

1. PATENTS—ELECTRICAL CONVERTERS—INFRINGEMENT.
    Claim 4 of letters patent of the United States No. 366,362, dated July
    12, 1887, issued to George Westinghouse, Jr.. for "improvements in elec-
    trical converters", sustained, and *held* not infringed.

2. SAME.
    The two rectangular coil openings shown in the drawings and descrip-
    tion of the converter are not "open spaces in its core" within the mean-
    ing of claim 4.

(Syllabus by the Court.)

In Equity.

See 121 Fed. 560.

Drury W. Cooper and Thos. B. Kerr, for complainant.
C. V. Edwards, for defendant.

BRADFORD, District Judge. The Westinghouse Electric and
Manufacturing Company has brought its bill against the American
Transformer Company, charging infringement of letters patent of
the United States No. 366,362, dated July 12, 1887, issued to George
Westinghouse, Jr., and by him assigned to and now held and owned
by the complainant. The patent relates to improvements in electrical
converters, now usually called transformers. Heat, representing loss
or waste, or, in a strict sense, conversion, of electric energy, is gen-
erated or developed in the coils and core of a transformer when in
use. In the coils, it is due to the resistance of the copper to the
electric current carried by them, and, in the core, it is due to eddy
currents, and hysteresis attendant upon the reversals of polarity of
the magnetic flux in the core, or, in other words, the magnetization
and demagnetization of the core in rapid succession. Heat increases
with the size and capacity of the transformer, lessening its efficiency
by reducing the conductivity of the coils and augmenting the hysteretic
losses in the core, and, if excessive, impairs not only the efficiency
but the durability and safety of the apparatus. Hence, it is important
that the temperature of the coils and core should not be allowed to
rise materially above the proper point, which has been stated to be
about 75° centigrade. It appears that where the capacity of the
transformer is small, not exceeding five or ten kilowatts, no special
provision is necessary in order to get rid of an excess of heat, as the
coils and core will remain sufficiently cool through radiation into
the surrounding air. Where, however, the transformer has a ca-
pacity exceeding ten kilowatts it is necessary to make special pro-
vision to avoid an undue increase in temperature. For this purpose
oil, or possibly some other suitable liquid, has been used. The trans-
former is placed in an inclosing metal case filled with oil. When
so immersed any excess of heat, within certain limits determined by
the size and capacity of the transformer, is dissipated by being car-
ried through conduction and convection from the coils and core to

the inclosing-case and thence by radiation. For present purposes it is unimportant, where the heat is beyond those limits, to consider methods by which the proper temperature best may be maintained. The patent in suit covers particular means for preventing the over-heating of transformers. The patentee thus states the general nature and object of his invention:

"The invention relates to the construction of a class of apparatus employed for transforming alternating or intermittent electric currents of any required character into currents differing therefrom in certain characteristics. Such apparatus are usually termed 'induction coils' or 'converters.' The object of this invention is to provide a simple and efficient converter which will not become overheated when employed for a long time in transforming currents of high electro-motive force, and which will be thoroughly ventilated."

The drawings of the patent represent respectively a cross section and a longitudinal section of a converter or transformer. They are as follows:

With respect to these drawings and in describing the invention the patentee says:

"Referring to the figures, A represents the core of the converter, and $C^1$ and $C^2$ the respective coils. The core is preferably composed of thin plates of soft iron a a, separated individually or in pairs from each other by thin sheets of paper or other insulating material. This insulating material is preferably applied to one surface of the plates by being glued or pasted thereto, and these surfaces may lie all in the same direction, thus separating the plates individually, or alternate plates may have their covered surfaces in one direction and the intervening plates have their covered faces in the opposite direction, thus magnetically separating the plates in pairs. The plates are preferably constructed with two rectangular openings $e^1$ and $e^2$, through which the wires pass. For convenience in inserting the coils, or rather in applying the plates to the coils after the latter have been wound, a cut is made from each opening, as shown at b b. By bending the ends c c upward the plates may then be thrust into position, and the ends c c then close about the coils. The tongues $e^3$ of succeeding plates are preferably inserted from opposite sides. I do not, however, herein broadly claim an induction-coil having its core constructed of thin plates formed in the manner just described; but such invention is claimed in an application of even date herewith, filed by Albert Schmid. Each group of—say five or six—plates thus applied is preferably separated from the succeeding group by air-spaces. These may be produced by passing tubes $f^1$ $f^1$, which may be of

soft iron or other metal, or of vulcanized fiber, along the lengths of the plates. It may be sufficient in other instances to block the groups of plates apart at intervals instead of extending the tubes the entire length. Preferably, also, the primary and secondary coils $C^1$ $C^2$ are separated from each other in a similar manner. In this instance blocks or tubes $f^2$, of non-conducting material, are used. The tubes may be perforated, as shown at $f^3$ $f^3$. Where the converter is to be used in open air, the tubes $f^1$ and $f^2$ would permit a free circulation of air, and thus aid in keeping the converter cool. It may be preferred in some instances to surround the converter with some oil or paraffine or other suitable material, which will assist in preserving insulation and will not be injured by heating. This material when in a liquid form circulates through the tubes and the intervening spaces of the coils and plates, and preserves the insulation, excludes the moisture and cools the converter. The entire converter may be sealed into an inclosing-case, H, which may or may not contain a non-conducting fluid or a gas."

While the patent in suit contains five claims the charge of infringement has been restricted to claim 4. It is as follows:

' "4. The combination, substantially as described, of an electric converter constructed with open spaces in its core, an inclosing-case, and a non-conducting fluid or gas in said case adapted to circulate through said spaces and about the converter."

This claim has been the subject of litigation elsewhere and adjudged valid. It was upheld by Judge Hazel in Westinghouse Electric & Mfg. Co. v. Union Carbide Co. (C. C.) 112 Fed. 417, and, on appeal, by the court of appeals for the second circuit, 117 Fed. 495, 55 C. C. A. 230. It was also recognized as valid by Judge Adams in Westinghouse Electric & Mfg. Co. v. Wagner Electric Mfg. Co., 129 Fed. 604. Its validity within the limits of a proper construction is admitted here; the whole contention at the hearing being directed to the question of infringement. Most, if not all, of the elements of the combination of claim 4 were old in the art, but the combination itself was new. It has proved of great utility and must, in my judgment, be accorded patentable novelty.

It appears that after the complainant became the owner of the patent in suit and prior to the filing of the bill the defendant manufactured and sold a number of transformers, designed to be used in cases filled with oil, and having space blocks between their core plates. Their construction is shown by complainant's exhibit A. They admittedly infringed claim 4. Upon the bringing of the patent in suit to the attention of the defendant, however, the space blocks were removed from between the core plates, and the spaces in which they had been inserted were filled. And the complainant by stipulation of record on the second day on which evidence was adduced in this case released the defendant from all claims for damages or profits arising from the above mentioned infringement. It further appears that the defendant has not since that infringement manufactured, sold or used any transformer similar to that shown in exhibit A, and that it neither threatens nor intends such manufacture, sale or use. The construction so admitted to infringe had parallel primary and secondary coils, and a core composed of thin plates of soft iron arranged in groups separated from each other by blocks, whereby spaces between the groups were provided; the coils and core being inclosed in a metal case containing oil, which, when the transformer was in

use, circulated through the open spaces in the laminated core. The construction now complained of differs from that shown and described in the patent in suit, and from that just referred to, in that the laminæ or plates of the core are not separated into groups, with intervening spaces through which oil, paraffine or other suitable liquid or fluid may circulate. The elements of the combination of claim 4 are, first, an electric converter; second, open spaces in its core; third, an inclosing-case; and, fourth, a non-conducting fluid or gas in said case adapted to circulate through said spaces and about the converter. Has the defendant's transformer "open spaces in its core" in the same sense in which those words are employed in claim 4? If it has not, it lacks an essential element, and the charge of infringement with respect to it must fall. It has a solid core, unless, indeed, the two rectangular openings for the coils properly can be considered "open spaces in its core." But spaces between the core as a whole and the coils should not be confounded with spaces in the core. The core of the transformer is so constructed as to leave the rectangular openings for the reception or accommodation of the coils. It is made of such form as to surround them. Were it not for coil openings the plates could not constitute the core of a transformer of the general type shown in the patent in suit. The core is perfect and complete irrespective of the presence or absence of coils in its openings. In its entirety and by its necessary construction a core of the type of transformer under consideration has coil openings. Neither a coil opening nor any part of it can legitimately be held to be an open space in the core within the meaning of claim 4. I find nothing in the claims, description or drawings of the patent in suit at variance with this conclusion, but, on the contrary, much to fortify it. Nowhere in the drawings or description is a coil opening, in whole or in part, designated or referred to as a space in the core. To ascertain the true meaning of the words "open spaces in its core" as used in claim 4 regard must be had to the general character of the invention. Its object was to prevent the overheating of the coils and core, and Westinghouse proposed to accomplish it by providing an intervening space between the primary and secondary coils, and by opening up spaces in the core itself in such manner as to expose to the oil or other surrounding medium a heat-dissipating surface of large area. The open spaces in the core thus designed were spaces which would not exist, were it not for the desired cooling of the core. The only open spaces in the core shown in the description or drawings are those produced by the insertion of tubes or blocks between groups of core plates. The patentee states that the drawings represent longitudinal and cross-sections of "a converter involving the features of the invention." Tubes are disclosed in the drawings, but not blocks. Blocks, however, are treated as the equivalent of tubes, for the patentee, referring to the spaces between the groups of plates, says:

"These may be produced by passing tubes $f^1$ $f^1$, which may be of soft iron or other metal, or of vulcanized fiber, along the lengths of the plates. It may be sufficient in other instances to block the groups of plates apart at intervals instead of extending the tubes the entire length."

It is further stated:

"Each group of—say five or six—plates thus applied is preferably separated from the succeeding group by air spaces."

While it is said that the groups are "preferably separated" the fact remains that the only open spaces in the core, described or disclosed, are those produced by separating or dividing its laminæ into groups. The patentee further says:

"Preferably, also, the primary and secondary coils $C^1$ $C^2$ are separated from each other in a similar manner."

The statement that the surrounding medium "when in a liquid form circulates through the tubes and the intervening spaces of the coils and plates" manifestly refers, on the one hand, to the spaces intervening between the primary and secondary coils which "are separated from each other in a similar manner," and, on the other, to the spaces intervening between separated groups of core plates, but not to spaces between the core as a whole and the coils. Be this as it may, however, the "spaces" of claim 4 are "open spaces in its core." The "open space" of claim 1 is that intervening between "parallel primary and secondary coils." The combination of claim 2 has as its elements, first, primary and secondary coils, second, a core composed of laminæ of soft iron arranged in groups and, third, "open, spaces" separating said groups. This claim, aside from the coils, specifically refers to the construction of the core, but lacks the elements of "an inclosing case" and "a non-conducting fluid or gas in said case adapted to circulate through said spaces and about the converter," included in the combination of claim 4. The elements of the combination of claim 3 are, first, a core composed of soft iron plates arranged in groups and, second, "open tubes" intervening. This claim specifically refers to a particular construction of the core, but, like claim 2, lacks two of the elements of claim 4. Claim 5 includes the following elements: first, primary and secondary coils, second, a core composed of magnetically separated laminæ of soft iron arranged in groups, third, "air spaces" separating the different groups from each other and, fourth, the arrangement of the laminæ of the several groups in different parallel planes. This claim also specifically refers to a particular construction of the core, but, like claims 2 and 3, lacks the same two elements of claim 4. In the combination of claim 4 "open spaces in its core" as well as an "inclosing-case" and a "non-conducting fluid or gas" therein, are "substantially as described." No doctrine of equivalency can dispense with the open spaces in the core of the transformer, for they are a necessary element of the combination. Without them the claim cannot be satisfied. Open spaces might be produced in the core other than those specifically set forth in the drawings or description, which would be the equivalent of the latter. The core itself might, for instance, be cut into in various directions in such manner as to expose what may be termed internal heat-dissipating surfaces to the oil or other medium surrounding the transformer, and in such case, the other requirements of the combination being satisfied, infringement could be found. But the essence of the first element of the claim insisted on

is that the open spaces of the transformer must be "in its core." The defendant's transformer, touching which the charge of infringement is now pressed, has no "open spaces in its core" within the meaning of claim 4, and, therefore, the charge of infringement cannot be sustained as to it. This conclusion accords not only with the weight of the evidence, in my judgment, but with judicial decisions involving the consideration of the essential features of claim 4 now in suit. The witness Jenks, one of the complainant's experts here, testified for the complainant in Westinghouse Electric & Mfg. Co. v. Union Carbide Co., supra. The defendant in that case used a transformer having the "open spaces in its core" set forth in the description of the patent in suit. It was admitted that, if claim 4 was valid, it had been infringed. Jenks in his testimony in that case, among other things, said:

"No great step was taken in improvement of their design and protection until the originality of Mr. Westinghouse attacked the problem of enlarging the size of converters and adapting them to extreme conditions of encompassment, without increasing the dangers which accompanied their use. His grasp of the subject, and the skill which has prompted so many of his inventions, indicated to him that the mechanism of the converter must be modified by spreading out and dividing into sections its iron core, and thus increasing the surface from which a dissipation of the heat of the core and the coil might be carried on. * * * The patentee proposed to construct the core of this static converter of thin plates or laminæ, such as were well known to the electric art, and to divide these plates into groups, separated from each other by air spaces; also to similarly separate the primary and secondary coils of the converters, also to encase these coils and core, and if necessary seal the case and imprison therein a non-conducting fluid or gas, impliedly other than air, so that a free circulation of this fluid or gas among the coils or groups of plates and between them and the outer case, would be secured. * * * Those skilled in the transformer art turned to entirely different means when it became necessary to dissipate the heat which those transformers developed. Those means included the subdivision of the stationary core, and the combination of such subdivided core with a non-conducting fluid or gas and an enclosing case."

These views are clear and satisfactory. It is difficult, if not impossible, to reconcile them with the opinions expressed by the same witness in this suit. By agreement of counsel in open court the record in Westinghouse Electric & Mfg. Co. v. Union Carbide Co. was submitted for consideration by this court. Judge Hazel, in delivering the opinion of the circuit court in that case, said:

"The core of the Westinghouse patent is composed of thin plates of soft iron, in groups having sectional openings, and separated by thin sheets of paper or other insulating material. The insulating material is so arranged as to magnetically separate the plates in pairs. The method of constructing an induction coil or transformer having a core of thin plates is disclaimed by the patentee. It is not claimed to be new in the art to arrange a transformer so as to accomplish a means of ventilation of the parts, and thereby prevent a waste of energy through heating. The claim is that by the arrangement of various known elements, and by the introduction of new elements, to wit, dividing the iron into sections, and separating the coils, thereby increasing the surface over which heat dissipation in the core and coils may be carried on, aided by oil as an insulating material, and adding an inclosing case, a new combination, producing a new and beneficial result not before attained, is contributed to the art. * * * The Westinghouse patent stated that the plates are preferably separated, and that it may be preferred in some instances to surround the transformer with oil

or paraffin or other suitable material. It is stated by the patent that 'the converter or transformer may be sealed in an inclosing case, and may or may not contain a nonconducting fluid or gas.' It is insisted that these are matters of preference or recommendation only and do not constitute essential features of the patent, but this, however, must be read with claim 4 of the patent. It is quite true that a feature which is mentioned only by way of recommendation in describing an invention must usually be considered as a subordinate, and not an essential, part of the patent. * * * But the claim upon which the complainant relies still clearly indicates the intention of the patentee to claim as essential the features described by the specifications as preferably employed."

Judge Townsend, in delivering the opinion of the circuit court of appeals in that case, said:

"The patentee primarily proposed to obviate the serious objection of loss of energy by overheating involved in such transformation by separating the plates of the core and the primary and secondary coils from each other, so as to permit of ventilation. This construction adapted for ventilating purposes is covered by the other claims not in suit, and is not involved herein. * * * Complainant contends that this claim" (claim 4) "covers a transformer whose surfaces are cooled by means of oil circulating through said open spaces 'in said core and confined in said inclosing case. * * * This claim covers such an inclosing case as will confine the nonconducting fluid, and such open spaces in the core as will permit the circulation of the liquid through them. * * * The patentee seems to be entitled to claim the means by which the external and internal surfaces of the heat-producing parts of a converter were cooled by such an arrangement and separation of parts as would permit the circulation about them of oil, and the means for the retention of said oil within and about said surfaces, whereby the heat from the oil radiated to the surrounding air."

Westinghouse Electric & Mfg. Co. v. Wagner Mfg. Co., 129 Fed. 604, involved the question of infringement of claim 4 of the patent in suit by means of a construction substantially identical with that of the defendant here; there being no separation or division of the core of the transformer by the insertion of tubes or blocks, or otherwise, nor any spaces formed by cutting into the core itself. Judge Adams, among other things, said:

"These numerous parallel open spaces so shown in the drawings and model, and any other open spaces, whether parallel or not, cutting through the body of the surrounding core and extending into the interior opening containing the coils, are in my opinion the 'open spaces in its core' contemplated by claim 4. * * * The invention has for its main purpose only the physical means for effectually securing this circulation of oil. It deals with the core itself and divides it up into groups of plates, each group separate from the other in such way as to make numerous parallel open spaces in the core leading from its outer surface on all its four sides into the interior opening made for the introduction of the coils. This interior opening, called in the patent 'two rectangular openings $e^1$ and $e^2$, through which the wires pass', is not in my opinion 'an open space in its core' within the meaning of claim 4. I adopt the views of Prof. Nipher with respect to this rectangular opening. He says: 'The core is not the core of a transformer or converter until these rectangular openings are made through it.' He says further: 'These openings give character to the core.' 'It is not a core until they exist there.' 'The core is in fact given such a form that it surrounds the coil in a certain sense, and the space so surrounded by the core might be called a coil opening.' The core of a transformer is the iron part of it. It must be so constructed as to permit the introduction of the coils of wire approximately through its center. The wire coil must be put in to make a transformer. I cannot understand how this space left in the inside of the iron for this purpose can be an open space in the core. It might be as well

said that the space left on the outside of the iron, between it and the incasing tank is an open space in the core. The defendant's device has a space between the coils, and has also this rectangular opening for the introduction of the coils into the core, but for the reasons above expressed, these are not 'open spaces in its core' within the meaning of the patent in suit."

It appears by the record in the present case that in Westinghouse Electric & Mfg. Co. v. Wagner Mfg. Co., supra, application was made for a preliminary injunction specifically restraining the further manufacture or sale of the construction ultimately held by Judge Adams not to infringe claim 4. Judge Amidon denied the application for such injunction and in his opinion, not yet reported, among other things, said:

"The defendant's device has no open spaces in its core; the cooling liquid does not circulate through any such spaces. * * * It is manifest from a consideration of the specifications of the Westinghouse patent, that the open spaces in the core are a prominent and distinctive feature of that patent, and that the defendant's device does not contain that element."

Judge Kirkpatrick, in denying a preliminary injunction in this case, 121 Fed. 560, after referring to Westinghouse Electric & Mfg. Co. v. Union Carbide Co. and while not passing on the merits, said:

"The construction of the defendant in the case at bar differs from that of the Carbide Company there in suit. * * * The claim of the complainant's patent has been sustained, but it does not appear that the construction there given it was such as is now claimed, or that it would be applicable to the defendant's apparatus."

The apparatus touching which the charge of infringement is controverted is illustrated on pages 4 and 6 of exhibit B. In view of the decisions and for the foregoing reasons, I am satisfied that the bill cannot be sustained as to that construction. The only other type of transformer, manufactured, sold or used by the defendant, of which complaint has been made in this suit, is that illustrated in complainant's exhibit A. Admittedly it infringed claim 4. But the defendant has not at any time since December 1, 1902, manufactured, sold or used any transformer of that type, and was, as before stated, on the second day on which evidence was adduced in this case, namely, February 26, 1903, released from all claims for damages or profits arising from its former acts of infringement with respect to it. And it also appears that the defendant neither threatens nor intends to manufacture, sell or use any transformer of the last-named type. Under these circumstances the bill must be dismissed. There should, however, be an equitable division of the costs, and to that end all the costs of the case which accrued prior to February 27, 1903, should be borne by the defendant; and the residue by the complainant.

Let a decree be prepared in accordance with this opinion.